In the Matter of ABRAHAM KRIMSKY, an Attorney, Respondent.

First Department, January 13, 1928.

**Attorney and client — disciplinary proceedings — respondent disbarred for converting funds of client.**

The respondent, an attorney, was retained to prosecute two actions, one for personal injuries to an infant and the other for damages suffered by the father of the infant for loss of services of the infant. The respondent settled the claim with the insurance carrier and received a check for $525 which he converted to his own use. He was entitled to receive a percentage for his services. The balance due to his clients was paid to them by respondent's father after a complaint had been made to the grievance committee. The respondent gave varying and evasive attempted explanations of his failure to pay. At first he contended that he had sent a check and that it must have been lost in the mail, and that he had in his bank sufficient funds to meet the check. Later he stated that he had not sent the check but had written a letter to his client asking him to call. In his testimony before the official referee he contended that the check received from the insurance carrier was cashed and the money placed in his files in his office and that his office was robbed. A transcript of the respondent's bank account shows that at no time, with the exception of a few days, was his account sufficiently large to meet the payment which he should have made.

The respondent is disbarred in view of his conduct in converting the funds of his client, and especially in view of his evasive and untruthful statements before the grievance committee and the referee.

DISCIPLINARY proceedings brought by the Association of the Bar of the City of New York.

*Einar Chrystie*, for the petitioner.

DOWLING, P. J. The respondent was admitted to the practice of the law in April, 1923, in the New York Supreme Court, Appellate Division, Second Department.

The learned official referee, after a most careful and painstaking hearing, has reported that the charges against the respondent have been substantially established by a preponderance of the credible evidence before him.

The charge against the respondent is in substance that after he had been retained by Michael J. McHugh to recover damages for personal injuries suffered by his infant daughter, the respondent, on June 29, 1926, received the sum of $525 in settlement of the claim, which sum he converted to his own use; that he concealed from McHugh the fact that he received money and failed to pay over any part thereof; that on October 13, 1926, after McHugh had brought the matter to the attention of the petitioner, the respondent's father paid McHugh his share of the money collected.

The respondent did not file any answer to the petition served

upon him, but the court, by order entered March 15, 1927, appointed one of the official referees to take proof of the charges set forth in the petition and to report the same with his opinion thereon.

The evidence shows that on June 28, 1926, an order was entered in an action brought in the Supreme Court, New York county, in behalf of Rosemary E. McHugh, by Michael J. McHugh, her guardian *ad litem*, authorizing the settlement of her claim for damages for personal injuries for the sum of $400 and fixing $100 as the fee of the respondent for his services as attorney for the plaintiff in the action. At or about the same time Michael J. McHugh agreed to settle his claim for damages suffered by reason of his daughter's injuries for the sum of $125, and of this amount the respondent was entitled to receive fifty per cent, or $62.50. McHugh individually and as guardian *ad litem* of his daughter was, therefore, entitled to the aggregate sum of $362.50 of the amount received in settlement.

On June 29, 1926, the respondent received from the United States Casualty Company a check for the sum of $525 in settlement of the claims of Michael J. McHugh individually and as guardian *ad litem* of his daughter, Rosemary E. McHugh. The respondent did not notify McHugh that he had received this money, and late in July or early in August McHugh telephoned to respondent's office on several occasions and inquired about the case. The person answering the telephone, who stated that he was the respondent, gave McHugh various reasons why the money had not yet been sent to him and told him that it would probably be sent within the following week. On September 15, 1926, McHugh went to the office of the petitioner's committee on grievances, and in accordance with the suggestion of the committee's representative, sent to the respondent by registered mail a letter of which the following is a copy:

"*Sept.* 15, 1926.

" Mr. ABRAHAM KRIMSKY,
    " 200 Broadway,
        " New York, N. Y.:

" DEAR SIR.— May I ask that you be kind enough to advise me by return mail when I may expect settlement in the case of my daughter Rosemary E., against Moritz Neuman, also the number of the case and the court in which said case is filed.

" Your kind and prompt attention in this matter will be greatly appreciated by
                                            " Yours truly."

Late in the evening of October 12, 1926, the respondent's father and brother called upon McHugh at his residence in Tuckahoe,

Westchester county. They asked him, in substance, if he insisted upon pressing his complaint. McHugh replied that he had no object in doing that, and that what he wanted was his money. It was then arranged that McHugh would call at the office of the respondent's brother on the following day. He did so and there met respondent's father, who accompanied him to the respondent's office and there, in respondent's presence, gave him $362.50 in cash. McHugh then signed a letter prepared by the respondent, addressed to the petitioner, in which he in substance attempted to withdraw the charge and asserted that he had received the money he was entitled to.

The respondent gave contradictory, varying and evasive attempted explanations of his failure to pay the money due McHugh. Originally, on his first appearance before the grievance committee, he had claimed that six or seven days after June thirtieth he sent a check to McHugh for the amount due him. His letter containing this check never came back to him, nor did he ever hear from McHugh that it had been received by him. In fact his first communication from McHugh, he swore, was the registered letter from him demanding the payment of the amount due him. He said he had a bank account in the Madison State Bank, and he might have had one in the Lawyers Trust Company, but he " did not put it in that bank at all." He said he also had a small savings bank account in the National City Bank, but it was for a very small amount, and he never made any deposits therein nor withdrawals therefrom. He finally said that the check to McHugh, which he claimed was lost in the mails, had been drawn on the Madison State Bank, and that there was enough money there at that time to pay the McHugh check.

A photostatic copy of the draft given by the casualty company to the respondent in settlement of the McHugh case was exhibited to the respondent, and it was then established that he had cashed the draft and not deposited it in his bank account. The respondent stated: " I either deposited the proceeds or used the proceeds. I don't remember. All I can say is this: As far as Mr. McHugh's check is concerned, the one I issued to Mr. McHugh, there was enough money in the bank even without this money, to pay Mr. McHugh's check." After the respondent had made these statements to the effect that within a few days after receiving the money he had sent McHugh a check drawn on the Madison State Bank, in which there were sufficient moneys to meet the obligation, the respondent was questioned as follows on behalf of the committee: " Will you give the Committee an order on the bank requesting them to furnish us with a transcript of your bank account from the

25th of June until the 12th of October? '' He agreed to furnish such a transcript, but then began to qualify his statement that he had enough money on hand in the Madison State Bank to meet the McHugh alleged lost check, and would only say that " during the month of July I had money there."

Upon a further hearing, the attorney for the committee stated that on October 22, 1926, he had sent respondent a letter inclosing a requisition for a transcript of the bank account with a request that respondent sign it, and that no reply had been received. The respondent then made the following statement:

" Well, I have received it. I will admit that I had received it but I have been, during that time and ever since this thing has been going on, in such a condition that I really do not know just what to do. I don't know just why this proceeding is being held against me, but I may say that it is really shattering my hopes every day — daily, and it has really put me in a frame of mind where I am practically indifferent to things. I don't know just — I really never felt that I had done anything at all wrong.

" I might say to you, gentlemen, in going back to my office, in view of the fact that you questioned me about the files at that time, I looked at my files and I have my entire file here. I have those two letters, in addition to all the other papers here. In the letter I notice that I have not mentioned that I enclose a check but that I asked him to call.

" This was all during a period in the summer time where most of the time I was away. Mr. McHugh had never called at my office, never made a demand upon me; never asked me for the money. When he first came and made a demand upon me I gave it to him. He never came to me at all."

It will thus be seen that respondent now entirely abandons his previous theory about having sent a check to McHugh. The reason appears from what followed: " Mr. Chrystie: How about the transcript? Mr. Krimsky: Well, the letter which I found in my files does not say that check had been sent at all. Mr. Chrystie: How about giving us a transcript of your bank account? Mr. Krimsky: But I never sent a check. Mr. Chrystie: That hasn't got anything to do with it. You said that you had to your credit in that bank more than enough to pay Mr. McHugh's, the complainant, share of the settlement, from the time that you received the money up to the time that you paid him. Now, that fact can be established very easily by the presentation of the transcript of the bank account. That was the reason I asked for it and you agreed to furnish it. That is three weeks ago. The Chairman: Have you got any objection to writing a letter authorizing Mr.

Chrystie to obtain the transcript of your bank account? Mr. Krimsky: Well,— Mr. Chrystie: I have sent a letter to Mr. Krimsky for his signature. A letter addressed to the bank. Mr. Krimsky: I do not deny it. I think, in fact, you sent me two. The Chairman: Why didn't you sign the letter and return it? Mr. Krimsky: You do not know my frame of mind. In fact I am not myself. I have not been myself. It is not only worrying me but my family too."

He also, when asked by Mr. Chrystie, " Mr. Krimsky, isn't it a fact that when you received this money you were short of funds yourself? answered, " No, I was not short of funds, Mr. Chrystie."

He was later asked by a member of the committee: " Mr. Smith: Will you sign the order now, for the examination of your bank account? Mr. Krimsky: I will concede that there may not have been sufficient funds. Mr. Chrystie: That is not what the Committee asked for. Mr. Meyers: If he will concede that there was not sufficient with which to pay McHugh I think that is all there is to it. The Chairman: The only thing is a transcript of the bank account will show the exact facts as to how long the deficit continued. Mr. Meyers: That is true. Mr. Chrystie: It will also show what the state of the account was on the day he received it. The Chairman: I will ask him again. Are you willing now to sign an authorization to Mr. Chrystie to obtain a transcript of your bank account? Mr. Krimsky: I will say this much, Mr. Chairman, of course I do not want to answer you in an indirect way. So I will say this much: I do not know. I know that during the month of July, that was the month after I had received the funds, that during the month I received the funds, I had enough money in the bank to cover that check. That if there was after that time less funds it was not taken out all at one time but if there was any time less funds I could have covered if Mr. McHugh had come down and demanded the money. Mr. Arnold: That is not the question. Will you sign the requisition is what you have been asked. Mr. Krimsky: I will concede that at the time — Mr. Arnold: No, I am asking you that will you sign it or not. Answer yes or no. Mr. Krimsky: I won't sign it."

When the case came on for trial before the official referee, the petitioner produced a transcript of the respondent's bank account in the Madison Trust Company. This exhibit discloses the reason why the respondent changed his story after his first appearance before the committee on grievances. The bank account conclusively establishes that his statements to the committee when he first appeared before it were untrue because, from the date the respond-

First Department, January, 1928.      [Vol. 222

ent collected the money from the casualty company and up to October 13, 1926, when McHugh received the cash from the respondent's father, with the exception of two days, there never was sufficient money to the respondent's credit in the bank to pay McHugh his share of the money collected in his behalf. From September 7 to October 8, 1926 (with the exception of two days), when the account was closed, it was overdrawn. It is quite evident that when the respondent examined his bank account he discovered that if he furnished a transcript as promised, it would disclose that at the time he claimed the check had been sent to McHugh there was not sufficient money in the bank to meet it, and that if he had in fact sent a check to McHugh five days after the collection, as previously stated by him to the committee, the check would not have been honored. To meet this difficulty he changed his story and claimed that he had not sent a check but had sent a letter requesting McHugh to call.

When the respondent testified in his own behalf before the official referee, he told another story. He stated, in substance, that when he received the check in settlement of the McHugh claim from the casualty company, he needed fifty dollars in cash for a certain purpose, and accordingly had the check cashed by a friend; that he took fifty dollars from the proceeds and placed the balance in an envelope in a filing cabinet in his office and that a day or two later he found that the money had been stolen. He further stated that he suspected that the elevator runner in his office building had stolen the money, but he made no complaint and did not report the theft to anybody. This was the first time that the respondent had made any reference to the loss of the money. He did not say a word about it in his letter to the attorney for the committee on grievances answering the charges or in his statements made on both occasions when he appeared before the committee. He never mentioned it to his client, McHugh. He did not file an answer to the petition, although he had ample opportunity to do so. His explanation of his failure to make any reference to this robbery is that he did not think such an answer would be believed, and people would think it was a joke.

The official referee then questioned the respondent: " The Referee: Is it a fact that when you got the check from or in settlement of the case that you did not forthwith pay the money to your client and share the portion that was coming to him? The Witness: I did not pay it. The Referee: You did not? The Witness: No. The Referee: How soon after that did it occur to you that you were to notify your client that you had received the money? The Witness: What? The Referee: How soon after you had received

the money did it occur to you it was time to notify your client that you had received the money? The Witness: Well, I sent the client a letter on July 10th and I felt maybe I could give him some sort of a part payment. If it came to the worst I would get it from my father."

And he was further asked: " The Referee: You say you mailed the letter to your client and you had the money to meet it? The Witness: Yes, I had money at that time. I had money at that time in the bank, up to July 12th. Mr. Chrystie: No, I beg your pardon. That is not the record at all, except for a period of one day or two. But I think the Judge misunderstood you. I do not think the witness intended to say, Your Honor, that he sent any word to his client on the day that he collected or cashed that check. The Witness: No, not that day. Mr. Chrystie: He did not send any word to the client until some time after. The Witness: July 10th. The Referee: That is what I say, about July 10th. Mr. Chrystie: In the meantime he said nothing. The Referee: In the meantime you left that money in the file? The Witness: No. The Referee: Which had been stolen? The Witness: I got the money on July 30th. Mr. Chrystie: June. The Witness: I mean June 30th. I got the money about June 30th. The next day it was missing and July 10th I sent a letter to the client. The Referee: That is the letter that you say was not received by him? The Witness: Was not received by him. The Referee: And it didn't come back to you? The Witness: And it didn't come back to me. The Referee: Was it sent in one of your envelopes, that is, in your office private envelopes? The Witness: One of the office envelopes. The Referee: Containing your name and place of business? The Witness: Yes, sir. The Referee: And didn't come back? "

It developed that the copy of the letter claimed to have been sent by the respondent was dated July 15, 1926. On that date he only had sixty-one dollars and seventy-one cents in his bank account.

Mr. McHugh testified that during the latter part of July or early in August he made repeated efforts by telephone to get information regarding the collection made, all of which were unsuccessful. His testimony is obviously truthful. McHugh was a most reluctant witness against the respondent. He went so far as to personally ask the official referee to be lenient, stating that he (McHugh) had no feeling in the matter. It is quite evident that McHugh, since receiving his share of the money, has been willing to do anything in his power to assist the respondent out of his difficulties.

It is inconceivable that a member of the bar accused of converting his client's funds to his own use would fail to tell the members

of the grievance committee of the Bar Association investigating the charge, that the money had been stolen from his file if in fact this had taken place. We are forced to the conclusion that the robbery is an afterthought. The evidence conclusively establishes, as the learned official referee has found, that the respondent converted the proceeds of the McHugh collection to his own use and never made any effort to personally pay to McHugh what was due him. When such payment finally was made, it was not made by respondent but by his father, and only after the receipt of McHugh's registered letter had shown him further concealment was useless and exposure was imminent.

Furthermore, respondent has been guilty of repeated and palpable perjury in his efforts to explain his conversion of his client's money.

Respondent is unfit to remain a member of the legal profession, and he should be disbarred.

FINCH, MCAVOY, MARTIN and O'MALLEY, JJ., concur.

Respondent disbarred.